**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| KRASDALE FOODS, INC. and WEGMANS FOOD MARKETS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ASR GROUP INTERNATIONAL, INC., AMERICAN SUGAR REFINING, INC., DOMINO FOODS, INC., UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE f/k/a UNITED SUGARS CORPORATION, IMPERIAL SUGAR CO. n/k/a UNITED STATES SUGAR SAVANNAH REFINERY, LLC, MICHIGAN SUGAR COMPANY, LOUIS DREYFUS COMPANY LLC, COMMODITY INFORMATION, INC., AND RICHARD WISTISEN,<br><br>Defendants. | Case No. 26-cv-03751 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Krasdale Foods, Inc. ("Krasdale") and Wegmans Food Markets, Inc. ("Wegmans") (collectively, "Plaintiffs"), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, brings this action against ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"), United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United"), Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial"), Michigan Sugar Company ("Michigan Sugar"), Louis Dreyfus Company LLC ("Louis Dreyfus") (collectively, the "Producer

Defendants")[1], Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen," together with Commodity, "Commodity," and together with the Producer Defendants, "Defendants") for violations of the Sherman Antitrust Act and seeks treble damages, injunctive relief[2], and other relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

## I. NATURE OF THE ACTION

1. This lawsuit arises from Defendants' unlawful agreement to fix prices for Refined Sugar (defined below at ¶ 37), in the United States. The Producer Defendants are direct competitors and among the largest producers and sellers of Refined Sugar in the United States.

2. Beginning at least as early as January 1, 2019, the exact date being unknown to Plaintiffs at this time (the "Relevant Time Period"), Defendants and their co-conspirators conspired to artificially inflate the price of Refined Sugar in the United States.

3. Among the victims of the conspiracy are entities that directly purchased Refined Sugar from the Producer Defendants.

4. During the Relevant Time Period, Plaintiffs directly purchased significant quantities of Refined Sugar, including but not limited to Granulated Sugar (defined below at ¶ 38) from one or more of the Producer Defendants.

5. To implement their price-fixing conspiracy, Defendants exchanged detailed,

---

[1] Although the district court dismissed Defendants Michigan Sugar, Louis Dreyfus, and Imperial from the parallel consolidated class actions (*In Re: Granulated Sugar Antitrust Litigation*, No. 0:24-md-03110 (D. Minn.), ("*Granulated Sugar*") (ECF No. 471 at 36), Plaintiffs expressly name these Defendants herein for the purposes of preserving for appellate review their right to challenge those dismissals.

[2] Although the district court dismissed class plaintiffs' claims for injunctive relief in the parallel consolidated class actions (*Id.*), Plaintiffs assert these claims herein for the purpose of preserving for appellate review their right to challenge dismissal of these claims.

competitively sensitive, non-public information ("CSI") about Refined Sugar prices, capacity, sales volume, supply, and demand, in addition to the other conduct alleged herein. The Defendants' sharing of CSI bears all the hallmarks of concerted information sharing and demonstrates an effective enforcement mechanism of a price-fixing scheme.

6. The Producer Defendants shared specific information, through Commodity's clearinghouse, on their profits, pricing, costs, production levels, and sold positions[3]—all of which are key metrics and highly confidential and competitively sensitive in this market, that competitors would not share with each other in the absence of an agreement to do so.

7. The information gathered by and disseminated through Commodity was made available only to subscribing sugar-producer, owner, or marketer members. It is completely unavailable to the public or to non-subscribing members. Simply put, Commodity, and the Producer Defendants engaged in a "give to get" scheme, whereby they gave one another mutual and reciprocal assurances that each would provide CSI so long as the others did so.

8. It was contrary to each of the Producer Defendants' self-interest to share CSI with horizontal competitors. It was only the reciprocal and mutual agreement to share such information, which facilitated and maintained the price-fixing conspiracy, that reassured each Producer Defendant that its co-conspirators would adhere to the conspiracy and justified the information-sharing. This information-sharing thus served as an important monitoring and enforcement mechanism.

9. The information sharing specifically allowed the Producer Defendants to

---

[3] A sold position, as referred to herein, is the percentage of a seller's supply of Refined Sugar that is no longer available to purchase. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on prices going forward.

coordinate their pricing strategies based on the prices of raw sugar-futures contracts, as discussed below. The reciprocal and mutual sharing of such information facilitated and maintained the price-fixing conspiracy and reassured each Producer Defendant that its co-conspiring counterparts would adhere to the conspiracy.

10. Defendants were able to successfully implement their conspiracy because the sugar industry is structurally susceptible to collusion. For more than 80 years, the industry has been marked by repeated violations of the antitrust laws, including conduct similar to the conduct alleged here.

11. As a result of Defendants' conspiracy, Refined Sugar prices reached all-time highs during the Relevant Time Period.

12. Defendants' actions resulted in Plaintiffs paying more for Refined Sugar during the Relevant Time Period than they would have paid in a competitive market but for the unlawful conspiracy and the acts in furtherance alleged herein. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1,3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

## II. JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

14. Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22), and under 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District and were found in this District. Additionally, a substantial portion of the alleged activity affected interstate trade and commerce in this District.

15. This Court has personal jurisdiction over Defendants because, among other things, they either (1) transact business throughout the United States, including this District; (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

16. During the Relevant Time Period, Defendants' conduct was within the flow of, was intended to, and did in fact have a substantial effect on the interstate commerce of the United States and its territories.

17. During the Relevant Time Period, the Producer Defendants sold and shipped Refined Sugar in a continuous and uninterrupted flow of interstate commerce, which included sales and shipments to or from this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including this District.

## III. PARTIES

18. Plaintiff Krasdale Foods, Inc. is a Delaware corporation with its principal place of business located in White Plains, New York. Krasdale directly purchased Refined Sugar products from one or more of the Defendants at supra-competitive prices and suffered antitrust injury and damages as a result.

19. Plaintiff Wegmans Food Markets, Inc. is a New York corporation with its principal place of business located in Rochester, New York. Wegmans directly purchased Refined Sugar products from one or more of the Defendants at supra-competitive prices and suffered antitrust injury and damages as a result.

20. Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. It is a

global producer and seller of Refined Sugar. ASR Group asserts that it is "the world's largest refiner and marketer of cane sugar. The companies produce a full line of grocery, industrial, foodservice and specialty sweetener products, with a strong focus on innovation and product development, and hold leading positions in their core markets, which include some of the largest end-markets for sweeteners in the world."[4] ASR Group is vertically integrated. ASR Group is a subsidiary of Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire, Fanjul Corp.

21. Defendant ASR is a privately held Florida corporation and global producer and seller of Refined Sugar based in West Palm Beach, Florida.

22. Defendant Domino is ASR Group and ASR's marketing and sales subsidiary for Refined Sugar, with a current principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. Domino distributes Refined Sugar to retailers under the United States-based brads Domino® Sugar, C&H ® Sugar, and Florida Crystals®.

23. ASR/Domino operates cane refineries in Crockett, California; Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New York.

24. Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation, which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming. United sells sugar under the United and Crystal Sugar brands, as well as the Imperial and Dixie Crystal brands, which were formerly Imperial brands before

---

[4] ASR Group, *available at* https://www.asr-group.com/about-us.

Imperial was acquired by United. It also sells sugar sold under various store brands.

25. United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the [sic] Florida and Georgia."[5]

26. United sells Refined Sugar in bulk via truck and rail car. It also sells Granulated Sugar in various size packaging, including retail-size bags, 25-pound bags, 50-pound bags, and super sacks of 2,000 pounds. United approaches the market as a unified competitor, marketing and selling all the Refined Sugar produced by its member owners. United handles locating customers, negotiating sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

27. Defendant Louis Dreyfus is a Delaware corporation with its principal place of business in Wilton, Connecticut. In 2012, Louis Dreyfus acquired Imperial Sugar Company, which marketed and sold Refined Sugar produced at its sugar cane refinery in Savannah, Georgia.

28. Defendant Imperial is a Delaware corporation with its principal place of business in Georgia. United States Sugar Savannah Refinery, LLC, a wholly-owned subsidiary of U.S. Sugar, bought Imperial from Louis Dreyfus on November 30, 2022.[6]

29. Defendant Michigan Sugar is a Michigan corporation with its principal place of business in Bay City, Michigan. Michigan Sugar is owned by nearly 900 cooperative members who are farmers that grow sugar beets, which Michigan Sugar processes into Refined Sugar at its beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan.

---

5 *See* FAQ, United Sugar, *available at* https://www.unitedsugarpr.com/faq/.

6 Ron Sterk, *U.S. Sugar Corp. finalizes Imperial deal*, Food Business News, (Nov. 30, 2022), https://www.foodbusinessnews.net/articles/22731-us-sugar-corp-finalizes-imperial-deal.

30. Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058.

31. During the Relevant Time Period, Commodity was a strawman entity and tool for Defendants to exchange CSI and otherwise conspire. Commodity had no public presence. It did not maintain a website. It did not advertise its service to the public. It did not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few.

32. Defendant Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between the Producer Defendants.

33. Defendants Commodity and Wistisen are alter egos, and reference to one is a reference to both of them collectively. Throughout the Relevant Time Period, the Producer Defendants utilized Wistisen to facilitate the conspiracy and the exchange of confidential and proprietary CSI, regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy. Throughout the Relevant Time Period, the Producer Defendants utilized Wistisen to implement, monitor, and/or enforce the conspiracy and the exchange of confidential and proprietary CSI.

## IV. AGENTS AND CO-CONSPIRATORS

34. Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

35. Whenever reference is made to any act of a corporation, the allegation means that

the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

36. Defendants are also liable for the acts done in furtherance of the alleged conspiracy by companies they acquired through mergers, acquisitions, asset purchase agreements, or other business combinations.

## V. THE UNITED STATES SUGAR MARKET AND DEFENDANTS' MARKET POWER

37. "Refined Sugar" as that term is used herein, refers to sugar that its extracted from sugar cane or sugar beets and processed to yield granulated sugar, brown sugar, powdered sugar, and liquid sugar.

38. "Granulated Sugar" as the term is used herein is also known as white or table sugar and is a type of Refined Sugar that is ground and granulated to a certain size of particles and is processed, containing no coloring and no additives. It is the most well-known form of sugar in the United States, and it is commonly used in baking and cooking and in food products.

39. In addition to Granulated Sugar, Refined Sugar is also sold in other forms after it has been modified, including liquid sugar, brown sugar, and powdered sugar.

40. Granulated Sugar is the core input used to create the other Refined Sugars: liquid sugar is usually made by dissolving Granulated Sugar in water; brown sugar is made by adding molasses to Granulated Sugar; and powdered sugar is made by pulverizing Granulated Sugar and adding corn starch.

41. As the core input, refiners, such as Producer Defendants, routinely convert Granulated Sugar into powdered sugar, brown sugar, or liquid sugar using these additional processing steps, often performed at the same refining facilities.

42. Granulated Sugar can be manufactured from either sugar cane or sugar beets; the two versions are chemically indistinguishable. The process of making granulated sugar begins with extracting the juice from sugar cane or sugar beets. The juice is then processed to remove impurities and concentrated into a thick syrup. This syrup is further processed to remove any remaining impurities and water, resulting in the formation of sugar crystals. These crystals are then dried and sifted to produce the familiar fine texture of granulated sugar. Granulated Sugar does not include sugar in any liquified form.

43. Below is an illustration of the process for refining sugar cane into Granulated Sugar.[7]




44. Sugarcane is grown in Florida, Louisiana, and Texas. After harvest, sugarcane is milled into raw sugar and then refined. Sugar beets are grown in California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming. Sugar beets are processed directly into refined sugar.

---

[7] The Sugar Association, Sugar's Journey from Filed to Table, *available at* https://www.sugar.org/blog/refining-and-processing-sugar-cane/.

45. Granulated Sugar is manufactured and sold to direct purchasers who resell, consume, or further refine it into various other types of sugar products.

46. Refined Sugar, including Granulated Sugar, is a commodity product, meaning that the Refined Sugar sold by one Producer Defendant is highly interchangeable—even indistinguishable from—the Refined Sugar sold by other Producer Defendants. As such, competition for Refined Sugar sales is based principally on price, as opposed to quality or some other product characteristic.

47. Defendants' agreement to artificially raise, fix, maintain, or stabilize prices of domestic Refined Sugar sold in the United States constitutes a *per se* violation of Section 1 of the Sherman Act. As such, Plaintiffs are not required to define a relevant market or plead that Producer Defendants possessed market power within such a market for their claims relating to the *per se* violation. However, Plaintiffs allege the following facts to show that the relevant market is Refined Sugar sold in the United States and that Producer Defendants possessed market power in said market for any of their claims that are not analyzed under the *per se* standard.

48. Demand of one form of Refined Sugar is closely linked to the supply and provision of the others, such that market conditions affecting one form of Refined Sugar materially affect others. For example, if the price of Granulated Sugar rises, the prices of other Refined Sugars, for which Granulated Sugar is the key input, will rise as well.

49. While non-sugar sweeteners exist, they are not reasonable alternatives to Refined Sugar. For example a grocery store is unlikely to replace Refined Sugar with other sweeteners, even if Refined Sugar prices spike, because consumers prefer the taste of sugar, particularly for

items such as baked goods and coffee.[8]

50. Refined Sugar is marketed, transported, and sold nationwide. Although Refined Sugar can and is transported long distances domestically, regulatory, logistical and other challenges and differences prevent purchasers, such as Plaintiffs, from timely or economically substituting foreign-sourced Refined Sugar in the normal course of their business.

51. During all or part of the Relevant Time Period, Producer Defendants together with their co-conspirators controlled at least 70% of the market. According to an analysis by a United Sugars Corporation presentation, the Sugar "Supply: Industry Structure" as of February 2020 reflected the following market shares:

| Company | Percentage of Supply Industry Structure |
|---|---|
| United Sugars | ~29% |
| Domino Sugar | ~29% |
| National Sugar Marketing (NSM) | ~14% |
| Cargill | ~8% |
| Imperial | ~6% |
| Michigan | ~6% |
| Western Sugar | ~2% |
| Imports | ~7% |

## VI. DEFENDANTS AGREED TO ARTIFICIALLY RAISE, MAINTAIN, OR STABILIZE PRICES FOR GRANULATED SUGAR

52. Defendants engaged in a systematic and deliberate scheme to exchange

---

8 In the alternative to Plaintiffs' Refined Sugar product market definition, Plaintiffs allege that the relevant product market is Granulated Sugar. As with the broader category of Refined Sugar, Granulated Sugar has unique physical characteristics and properties that customers require for particular purposes. The total market share of Granulated Sugar for the Producer Defendants exceeds 70%.

competitively sensitive, non-public information to suppress competition and maintain artificially high prices for Refined Sugar in the United States. Through a network of coordinated exchanges facilitated primarily by Commodity, the Producer Defendants shared and received current pricing, sold positions, crop size and yields, and forward-looking price strategies. These exchanges were neither anonymized nor publicly accessible, serving only the agreed conspiratorial purposes of the Producer Defendants.

53. There is no economically rational reason for the Producer Defendants to share such information. This information was shared, including through Commodity, for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another.

54. Defendant Commodity purports to analyze the sugar industry. In fact, Commodity operated as a clearing house through which the Producer Defendants shared competitively sensitive information, such as current pricing, crop size, crop yields, future beliefs on pricing, and sold positions.

55. A sold position is the percentage of a seller's supply of Refined Sugar that has been sold. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward. Knowing each other's sold positions allowed the Producer Defendants to be more aggressive with pricing.

56. Due to United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producer Defendants know that as they sell out of Refined Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market that could force them to reduce

price. Knowing one another's sold position allows the Producer Defendants to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply.

57. Commodity has no public presence and does not maintain a website on the internet. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein. It does not advertise its services to the public.

58. Commodity does not gather information through voluntary surveys or polling that it then anonymizes. Rather, the Producer Defendants regularly shared competitively sensitive information about their pricing and sold positions with Commodity, and Commodity in turn contemporaneously shared that competitively sensitive information with the Producer Defendants.

59. Commodity does not make its reports available to Refined Sugar purchasers or others in the sugar supply chain, thereby strengthening the advantage that the Producer Defendants gain by sharing information only with one another as producers.

60. Commodity also does not publicly publish the competitively sensitive information it obtains from and shares with the Producer Defendants or otherwise make it available to consumers.

61. The Producer Defendants understand the competitive sensitivity of the information that they provide to Commodity and Commodity understands that the competitively sensitive information that the Producer Defendants share would not ordinarily be disclosed to competitors.

62. The information exchange was in real-time. Commodity provided this reciprocal information to the Producer Defendants rapidly, often within hours of having received it. The Producer Defendants then used the information they received from Commodity and other sources when deciding how much to charge for Refined Sugar enabling them to obtain supra-competitive

prices, which they did from the Plaintiffs.

63. Using the non-anonymized, competitively sensitive non-public information exchanged through Commodity, the Producer Defendants ensured that they would not undercut each other's prices and cause prices to decrease as they would in a competitive market. The Producer Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and sold positions only because Commodity collects this competitively sensitive information from each of them and shares it with the others, pursuant to their unlawful agreement.

64. United's Executive Vice President, Dirk Francis Swart, testified that United shared information with Wistisen because United "know[s] he's going to share information and we want the information that gets shared to be accurate." This testimony confirms that United did not merely provide information to Wistisen without regard to what he would do with it. To the contrary, United understood that Wistisen would transmit the information to competitors and nevertheless sought to ensure that the information transmitted through him was accurate.

65. Swart further testified that United wanted "better information about what [United's] Competitor's actual prices were" so that United could avoid "destructive situations" in which customers possessed sufficient information about competing prices to negotiate better prices. Thus, the information exchanged through Wistisen enabled the Producer Defendants not only to monitor one another's pricing, but also to prevent customers from using price differences among competitors to obtain lower prices.

66. The sharing of information between the Producer Defendants enabled them to artificially raise, fix, maintain, or stabilize the prices at which Refined Sugar was sold to their customers pursuant to their anticompetitive agreement.

67. As noted below, similar conduct by earlier sugar producers led to a consent decree

in 1978 that forbade such information exchanges by competitors.

68. Furthermore, as market leaders, the Producer Defendants account for the majority of Refined Sugar production and sales. As a result, smaller market participants are not an effective competitive constraint on Producer Defendant's dominance.

69. The exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Refined Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

## VII. THE ANTICOMPETITIVE AGREEMENT

70. The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Wistisen of Commodity pursuant to their anticompetitive agreement as alleged below, in order to raise, fix, maintain, or stabilize Refined Sugar prices.

71. United does not publish the company's current Refined Sugar prices or its sold position, *i.e.* the percentage of its crop that is booked for the current fiscal year. United's sold position was confidential information, and employees were supposed to keep that information secret. Nevertheless, United shared this information with Wistisen, who they knew would pass it along to ASR/Domino and other competitors.

72. ASR/Domino has a written code of ethics and business conduct policy that prohibits any employee from engaging in direct or indirect discussions regarding pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Wistisen knowing that he would provide the information to ASR/Domino's

competitors.

73. Despite these internal policies and others, the Producer Defendants shared competitively sensitive information with one another through Commodity during the Relevant Time Period pursuant to their agreement, including the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, and contract prices.

74. High-level executives at the Producer Defendants, who had direct involvement in pricing, shared the sensitive information with Wistisen. Commodity provided this reciprocal information to the Producer Defendants quickly, often within hours or even minutes of receiving it.

75. The Producer Defendants then used that information to set prices for their products pursuant to their price-fixing agreement. Thus, the Producer Defendants were able to use this information to raise, fix, maintain, and stabilize Refined Sugar prices pursuant to the unlawful agreement.

76. A September 16, 2019 email communication to Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed ASR/Domino's 2020 pricing and sold positions. Wistisen asked Mr. Henderson, "Wondering where you would put refined prices and coverage?" Mr. Henderson responded "Pricing for FY20: Northeast--$38.50 bulk basis Gulf --$36.50 bulk basis West --$39.00 bulk basis Cane refiners should be close to 70 to 75% covered for FY20. The open business that does remain will be at higher prices."

77. ASR\Domino disclosed this CSI knowing it would be shared with its competitors, and in return, that it would get its competitors' CSI. Wistisen responded that he would send crop and pricing updates in the next day or two, and noted, "The price updates I did receive today didn't have nearly the level of cane price increases you reported … but I bet they're headed that way[.]"

78. Commodity was not the only conduit of information between the Producer Defendants during the Relevant Time Period. On November 15, 2019, Gerald Kramer of Kramer Brokerage Co. shared Domino price quotes with multiple Louis Dreyfus managers, and inventory details, writing: "[a]lso told that Domino still has sugar to sell." In response, Jim Evans, National Sales Manager at Louis Dreyfus, expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President of Sales & Marketing at Imperial, in the same email chain, asked Gerald Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

79. On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Mr. Henderson that "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

80. On March 3, 2020, Mr. Henderson sent an email regarding "Colloquium Recap" to Mr. Sproull, which contained a "summary of points from the International Sweetener Colloquium," including "Michign firm at $38.50 for 2021", "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston --$37.50 FOB bulk," "NSM—still offering sugar in FY 20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial – 38.00/38.50 for CY 2021 on bulk EFG."

81. Similarly, in an email communication to Wistisen from Alan Henderson, ASR/Domino's Vice President of Industrial Sales, Mr. Henderson disclosed ASR/Domino's 2020

pricing and sold positions. ASR/Domino disclosed this confidential information knowing it would be shared with its competitors, and that it would get its competitors' confidential information in return. Wistisen responded that he would send crop and pricing updates in the next day or two.

82. The Producer Defendants provided accurate information to each other through Wistisen. ASR/Domino was typically "upfront" with the information it provided to Wistisen. In one example of such "upfront" information, Mr. Henderson disclosed to Wistisen in an August 2020 email pricing updates for ASR/Domino Refined Sugar.

83. Wistisen was clear to both United and ASR/Domino that he spoke with the other company, Michigan Sugar, and other sellers, and that the information he provided came directly from them. For example, Wistisen wrote to United that "ASR saying back up to $40.50 to $41," on one occasion, and on another, he wrote to ASR/Domino that "the United [pricing and sold position] info I provided was direct from them this morning. They held a huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, Wistisen stated that he did not have Michigan pricing yet, and "I hope to talk with them [Michigan] on Fri./Mon."

84. Wistisen often engaged in simultaneous conversations with the Producer Defendants, acting as a conduit for information on pricing and sold positions.

85. For example, on September 21, 2020, Wistisen separately emailed both ASR/Domino's Mr. Henderson and United's Director of Strategic Accounts Eric Speece, asking if there was "anything new of interest on the pricing front?" Each responded with their company's respective pricing and sold positions. The following day, September 22, 2020, less than three hours after receiving their emails, Wistisen emailed Mr. Henderson and Mr. Speece—less than a minute apart—sharing with each the information contained in the other's email. Wistisen told

ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like range is $38.50 to $41, nice increase over last month. . . . Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at low price, industry coverage 87%, all but NSM over 90+% booked." And Wistisen told Mr. Speece: "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and other southern refiners up 10-15% from the average. . . . Waiting to confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price … ."

86. The reciprocal exchange continued in November 2020. On November 16, 2020, Wistisen asked ASR/Domino's Alan Henderson what he was hearing regarding domestic raw and refined sugar pricing, whether United had pulled back from the spot market, and where Henderson would place prices and cane coverage. Henderson responded with specific ASR/Domino pricing and inventory information, including that prices had firmed based on higher Number 16 values, beets were close to sold out, imports were lower, nearby values had risen to $46.00 FOB, and ASR/Domino's calendar-2021 prices were $42.00 FOB in the East/West and $39.50 FOB in the Gulf, with cane coverage of 85–90%. This exchange has been illustrated diagrammatically below:



87. In yet another example, on February 15, 2021, Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/Refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

88. The next day, February 17, 2021, Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. . . . Selling FY21 firm, good activity, little to no competition from NSM or Western." Mr. Henderson then passed this along to others in ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]."

89. Similarly, Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. For example, in August 2020, he reported to Mr. Henderson at ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked." The next month, Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

90. The communications between Wistisen and United, Michigan Sugar, and ASR/Domino were candid and specific about pricing. For example, on August 17, 2020, Wistisen wrote to Mr. Henderson, providing him with sugar market updates and asked: "Where would you

put cane prices and coverage?" The next day, August 18, Mr. Henderson responded: "Quick update: Pricing: [next three lines redacted]."

91. On January 19, 2021, Wistisen wrote to United delivering several paragraphs of information on developments in the sugar industry. Near the end, he asked: "Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

92. On April 29, 2021, Wistisen wrote to Mr. Henderson: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information. Mr. Henderson responded: "I believe your pricing numbers below are very accurate."

93. In another message in April of 2021, Wistisen wrote to ASR/Domino asking about pricing. Mr. Henderson responded with specific prices and told Wistisen, "I believe your price predictions below are very accurate. Prices in PY21 are very firm."

94. On May 11, 2021, Wistisen wrote to ASR/Domino: "Are those higher spot prices, [redacted] holding up?" On May 12, 2021, Mr. Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at [redacted]." And a week later, on May 18, 2021, Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward."

95. On June 16, 2021, Wistisen wrote to ASR/Domino: "The word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm. … Any changes in ASR/Domino forward prices? I have you at [redacted] and [redacted]." Later, Wistisen adds: "The United info I provided was direct from them this morning."

96. Also in June of 2021, Wistisen sent an email to ASR/Domino sharing that he had "heard . . . United reportedly (I'll talk with them tomorrow) holding $36.50 gross . . . [a]nd that ASR is holding firm on the coasts." Mr. Henderson at ASR/Domino responded that "[w]ord on the street [was] United moving up a $1.00 cwt since bookings now over 60%." Mr. Henderson then went on to share future prices for the fourth quarter of 2021. In July, Wistisen responded, among other things, that "Michigan . . . 80+% [booked,] and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon)." ASR/Domino's Mr. Henderson forwarded Wistisen's message to coworkers saying, "no official word yet. Let's see if we can hunt something down."

97. On July 12, 2021, Wistisen wrote to ASR/Domino, asking, "What's happening on the cane side of the fence? Sounds like you're now [redacted], and Imperial $49. Where would you put forward pricing and coverage?" Mr. Henderson responded: "United price increase. Rich is thinking $2.00 increase but no official word yet."

98. Also in July of 2021, Wistisen emailed Mr. Henderson saying, "the United info I provided was direct from them this morning. . . . They are a hair shy of 90% sold."

99. The Producer Defendants' personnel also received sensitive pricing and sold position information from Wistisen on other sellers. For example, Wistisen provided Mr. Henderson pricing information regarding Cargill in July 2021, to which Mr. Henderson responded, "Cargill also makes no sense … . Last I heard they were at $38.50 gross fob bulk Gramercy."

100. The Producer Defendants relied on the sensitive information they exchanged through Wistisen to further their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Wistisen to others at

ASR/Domino with a recommendation of what price ASR/Domino would have to offer to win a specific customer's business. In another example, after receiving intelligence from Wistisen concerning a competitor's pricing, United's Mr. Speece expressed concern that that the competitor was selling at too low a price and suggested that United "may want to communicate pricing earlier than the colloquium to send a message."

101. ASR/Domino's Mr. Henderson frequently forwarded the information obtained from Wistisen to his sales team and his superior. For example, Mr. Henderson received, and forward to his subordinates, information from Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, Mr. Henderson forwarded to his boss, Mr. Rob Sproull, information on competitors' inventory positions that he received from Wistisen.

102. United also affirmatively used Wistisen to signal competitors. For example, United's Executive Vice President, Dirk Swart, told United's Mr. Speece that he wanted Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. Mr. Speece and Mr. Swart discussed what they wanted to "indicate" to Wistisen before deciding to continue the conversation by phone.

103. The sharing of information on pricing and sold position affects prices. United's Mr. Swart believed that if he had "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices. And customers know that competitors sharing this information harms them. For example, knowing that a competitor was sold out of Granulated Sugar gave the Producer Defendants a justification for a premium, or higher price.

104. There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity to secretly share highly confidential and proprietary detailed information about their pricing and sold position. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition.

105. Defendants knew and intended that their private exchanges of CSI would allow them to artificially raise, fix, maintain, or stabilize Refined Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

106. The Producer Defendants are interested in achieving higher prices for Refined Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

107. Similarly, United at times pulled its competitive punches for fear of prices dropping. ("As with all plans of this nature where we are looking at taking share from competitors, we need to factor in competitive responses … . In our minds the key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions.").

108. ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

109. ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

110. ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" for ASR/Domino because it would help to align United's pricing strategy with ASR/Domino's. ASR/Domino believed that after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry … ."

## VIII. PRODUCER DEFENDANTS AGREED TO A COMMON PRICING FORMULA

111. In furtherance of their conspiracy, the Producer Defendants developed and agreed to standardized pricing formulas.

112. In particular, the Producer Defendants referenced or relied on publicly observed index pricing, such as futures prices referenced in the Intercontinental Exchange No. 16 index, which measures domestic U.S. price for physical delivery of raw cane sugar, to set their FOB pricing for Refined Sugar.

113. Communications during the Relevant Time Period highlight how shared reliance on such benchmarks strengthened the effectiveness of Defendants' collusion. For example, in February of 2021, Commodity's Wistisen told Domino Sugar's Henderson that on the pricing side, sugar prices could increase thanks, inter alia, to the "history of excellent selling restraint/patience from ASR, [and] and high no. 16 prices."

114. Similarly, in July 2021, Domino Sugar's Henderson referenced United's then impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." Henderson later suggested that Domino Sugar was "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match Domino Sugar's prices of $40.50. This increase followed a "big huddle" among United's

marketing team, a clear signal of the considered and deliberate nature of the decision.

115. Imperial, even though it operated outside the domestic production framework before its acquisition by United, also relied on pricing formulas tied to Number 16 prices. Notably, Imperial declared that "acting as a price-taker would put the whole business at risk," reinforcing its disinterest in genuine price competition. Such statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

116. Absent the conspiracy, Producer Defendants would have no reason to share their pricing formula strategies as they concern the No. 16 index with Wistisen, who they knew would transmit such information directly to their competitors.

117. By jointly using common pricing formulas based on or informed by Number 16 index, the Producer Defendants created an environment where their price-fixing flourished, all to the detriment of purchasers such as Plaintiffs.

## IX. DEFENDANTS UTILIZED THEIR EXCHANGES OF CONFIDENTIAL COMPETITIVE INFORMATION TO RAISE PRICES IN PARALLEL

118. The Producer Defendants relied on and used the CSI that they obtained directly and indirectly, including through Commodity to increase prices in parallel during the Relevant Time Period.

119. For example, after Domino Sugar learned Cargill's and United's pricing in May 2021, including that in "talking with . . . Rich Wistisen" who believed that Cargill was "offering $2.00 above RRV beets" for FY22, Domino Sugar's Henderson forwarded that pricing information to Domino Sugar's Sproull, who shared the information again with his superior noting Domino Sugar had "an idea that we'd have to buy share through" and what they would "have to be around."

120. In another example, in January 2021, United's Speece expressed concern to his

colleagues at United after learning of Defendant NSM's pricing, and told them that United "may want to communicate pricing earlier than the colloquium to send a msg [message]." To ensure the message got out to United's co-conspirators, Speece told his colleagues, including Dirk Swart, an Executive Vice President of Industry Sales & Marketing, and Steven Hanson, Director of Marketing, that he would call Wistisen tomorrow.

121. Domino Sugar's Henderson frequently forwarded CSI from Wistisen to his sales team and superiors. For example, in May 2021, when Henderson received information from Wistisen that competitor United would likely be adding bookings and raising prices "not by just a dollar," Henderson forwarded that information internally.

122. And when Domino Sugar's Henderson learned, in August 2020, of Imperial's sold position, he quickly noted the value of such CSI, telling his Domino Sugar colleague that "Imperial being sold out gives us justification for a premium in Oct/Dec vs. Cy 2021 business."

123. In November 2020, United Executive Vice President Dirk Swart told United's Speece that he wanted Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38 and that United was considering increases given its sold position. They mulled over about what they wanted to "indicate" to Wistisen, illustrating how they viewed him as their conduit to their co-conspirators. Thereafter, they decided to move the conversation off email and onto a phone call—a further signal they recognized their wrongdoing.

124. As these examples demonstrate, Producer Defendants' exchanges of sold positions, prices and other CSI was not simply a useful data point, it was the basis upon which they could effectively raise prices together and extract a premium at the expense of purchasers like Plaintiffs.

125. And raise prices they did. Various data points confirm that Refined Sugar prices increased dramatically during the Relevant Time Period.

126. According to USDA tables, the average spot price of refined beet sugar in Midwest markets increased from $0.3614 per pound for calendar year 2019 to $0.5168 per pound for calendar year 2024. Similarly, the average price of refined cane sugar in Northeast markets increased from $0.3800 per pound for calendar year 2019 to $0.6012 per pound for calendar year 2024. Similarly, the price of Number 16 futures contracts for U.S. raw cane sugar also experienced an upward trend from an average price of $0.2612 per pound in 2019 to $0.3822 in 2024. And between 2019 and 2024, the Producer Price Index ("PPI") for refined sugar products and byproducts, an economic metric calculated by the U.S. Bureau of Labor Statistics that tracks the price changes for goods and services, increased from 171.600 in January 2019 to 261.647 in December 2024.

127. Moreover, many of the price increases occurred soon after opportunities to conspire, including following the annual International Sweetener Colloquium meetings.

128. Between February 24 and February 27, 2019, industry participants attended the International Sweetener Colloquium meeting in Florida. After the ISC meeting, in April 2019, beet processors held offers firm for 2019-20 season at around $0.35 per pound f.o.b. in the Midwest.

129. The price of refined cane sugar also jumped in the Northeast from $0.37 per pound f.o.b. in February 2019 to $0.42 per pound f.o.b. in November 2019. By November 2019, ASR/Domino was offering its cane sugar on the spot market at $0.44 per pound f.o.b. and United's Dirk Swart was telling Eric Speece that United wanted Wistisen "to hear $36.50/38.00" on beet sugar prices. Wistisen heard United's message loud and clear, so that by December 2019, beet sugar contracts pricing for the 2020-21 season continued to rise at between $0.36 and $0.38 per pound f.o.b. from the Midwest. These price increases had a cumulative effect, by February 2020, bulk Refined Sugar prices were reportedly at seven-year highs.

130. In 2020, the ISC meeting was again held in late February. Days after the end of the ISC meeting, on March 3, 2020, Domino Sugar's Mr. Hendersen sent an internal email to his colleague Mr. Sproull regarding "Colloquium Recap," providing, among other things, "a summary of points from the International Sweetener Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including that "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston--$37.50 FOB bulk," "NSM--still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial – 38.00/38.50 for CY 2021 on bulk EFG."

131. Following the February ISC meeting, in March and April 2020, beet processors offered beet sugar between $0.36 per pound f.o.b. to $0.38 per pound f.o.b. in the Midwest for the 2020-21 season. Indeed, Michigan Sugar offered its beet sugar for $0.38 per pound f.o.b. for 2021 while ASR/Domino offered refined cane sugar for $0.41 per pound f.o.b. Prices for spot bulk refined sugar also increased from $0.44 per pound f.o.b. to $0.46 per pound f.o.b. in March 2020.

132. On September 21, 2020, United conveyed to Wistisen that it was "firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt)." The next day, Wistisen confirmed that the "cane range [was now] $38.50 [cwt] to $41 [cwt] … ." Spot beet sugar prices from late September 2020 to December 2020 remained firm at $0.36.

133. On February 17, 2021, Wistisen conveyed the following to Mr. Henderson at Domino Sugar: "Long conversation with United: won't set FY 22 price list until March, but the plan remains to hold steady at $36.50 and $38.50. …" Indeed, following the ISC meeting on March 3, 2021, most producers continued to offer beet sugar for $0.36 f.ob. and $0.38.

134. In addition to holding prices firm in parallel, Defendants increased their prices in

parallel. By May 2021, United's stance had changed from holding firm on prices, and Wistisen, after "[j]ust talk[ing] with United" told Domino Sugar to "expect big action over the next month, … and at that time expect to raise prices, and not by just a dollar … ."

135. For the 2021-22 contract season, Michigan Sugar started its offers at $0.38 per pound f.o.b. increasing to $0.39 in June 2021. Also in June 2021, Domino Sugar offered its refined cane sugar for $0.42 per pound f.o.b. from its Northeast and West Coast refineries. By July 12, 2021, Domino Sugar was telling Commodity that "Our pricing for remainder of FY 21 is $48.00 [cwt] bulk basis all locations" and that "in the Oct./Dec. 21 period are $46.00 [cwt] fob bulk basis east/west and $44.00 gulf."

136. Following the ISC meeting in early March 2022, the average price of refined beet sugar spiked from $0.42 per pound f.o.b. in the Midwest in March 2022 to $0.70 in July 2022 – almost a 40% increase. The average price of spot refined cane sugar in the Northeast increased from $0.52 per pound f.o.b. in March 2022 to $0.53 in April 2022 and continuously increased to $0.68 in July 2022.

137. The DOJ in the Merger Action concluded that, like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline." For example, Domino Sugar internally discussed a decision to get "aggressive" on pricing, fearing that its action would "send[] a signal out to competitors that we are chasing business and lowering pricing." Domino Sugar's Robert Sproull instructed Mr. Henderson to "signal to the market" that there would be tightness and Domino Sugar would maintain price.

138. As further evidence of parallel conduct and pricing, Domino Sugar bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to

United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry… ." Further, "[a]fter speaking with his 'trusted friend,' the Imperial CEO, Domino Sugar's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [ASR/Domino]."

139. Defendants' pricing resulted in dramatic overall increases to the market for Refined Sugar. PPI of Refined Sugar Products and Byproducts rose during the Relevant Time Period from 171.600 to 261.647, an approximately 66% overall increase.

## X. ADDITIONAL PLUS FACTORS SUPPORT THE EXISTENCE OF A CONSPIRACY

140. Refined Sugar is a commodity product and competitors' pricing and sold positions is material information.

141. Because Refined Sugar is a fungible commodity, coordination is also easier to monitor and enforce. Where products are relatively undifferentiated and competition is principally based on price, observable differences in prices are more readily attributable to a competitor's deviation from coordinated pricing rather than to differences in product characteristics or customer-specific arrangements. The commodity nature of Refined Sugar therefore facilitated the Producer Defendants' ability to monitor one another's pricing, detect deviations, and maintain coordinated price levels.

142. The sugar industry is also vulnerable to coordinated interaction because of its structural dynamics.

143. United and ASR/Domino have connected ownership interests that further raise the risks of coordination. United States Sugar has an ownership interest in Sugar Cane Growers' Cooperative of Florida ("SCGC") through United States Sugar's wholly-owned subsidiary South

Bay Growers. SCGC, in turn, is one of the two owners of ASR/Domino.

144. As explained above, the Producer Defendants strategically used price signals (messages) they send as well as receive. For example, United sent signals (messages) to competitors about pricing and considered how its own actions may cause market-wide prices to decline and what to do to avoid that situation.

145. In addition to the extensive information sharing by the Producer Defendants, there are other "plus factors" that plausibly suggest the likelihood of collusion, including, but not limited to: (a) actions against unilateral self-interest, (b) high vertical integration, (c) high barriers to entry, (d) sugar industry consolidation and concentration, (e) inelastic supply and demand, (f) a lack of significant substitutes for Refined Sugar, (g) frequent opportunities to conspire, and (h) a history of antitrust violations by sugar manufacturers.

## A. Defendants Engaged in Conduct That, Absent Collusion, Would Have Been Contrary to Their Self-Interest

146. The Producer Defendants understood that the current prices, forward pricing strategies, and sold positions they provided to Commodity and Wistisen were highly confidential and competitively sensitive. In a competitive market, a producer would have a strong incentive to protect this information because disclosure to a rival could enable the rival to undercut its prices, target its customers, and take market share. There was therefore no unilateral economic rationale for the Producer Defendants to disclose such information to their horizontal competitors, except in the expectation that they would receive reciprocal information in return and use the information to reduce price competition.

147. The Producer Defendants also acted contrary to their unilateral self-interest by deliberately refraining from competing aggressively for customers in order to avoid causing their competitors to respond with lower prices. A firm with available supply ordinarily has an incentive

to offer a price slightly below a rival's price to capture additional customers and increase market share. Yet ASR/Domino's Alan Henderson explained that ASR/Domino decided not to get "aggressive" on pricing because it "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino instead sought to "signal to the market" that there would be tightness and that it would "maintain price."

148. Similarly, Imperial's Senior Vice President of Sales, Patrick Henneberry, expressed concern that lowering Imperial's prices "would be snatching something from United just as they are starting to show some upside price movement." A firm competing independently for customers would ordinarily have an incentive to take business from a rival when the opportunity arose. Imperial's concern about taking business from United, and its apparent desire to protect United's upward pricing movement, is instead consistent with coordinated conduct in which competitors sought to avoid disrupting one another's pricing.

149. These actions are difficult to reconcile with independent competition. They are consistent, however, with an agreement among the Producer Defendants to refrain from aggressive price competition, communicate pricing information to one another, and maintain prices at elevated levels. The Producer Defendants' willingness to sacrifice opportunities to compete for customers therefore provides additional evidence of their unlawful agreement.

**B. High Vertical Integration**

150. The Refined Sugar industry is almost entirely vertically integrated meaning that a Refined Sugar producer often owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Refined Sugar in their own refining facilities, and selling their Refined Sugar to direct purchasers. Producer Defendants' vertical integration further insulated them from competition and

further incentivized the formation and maintenance of their conspiracy.

**C. High Barriers to Entry**

151. There are high barriers to becoming a manufacturer of Refined Sugar. The start-up capital necessary to compete would be substantial. Refined Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Refined Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for United States Department of Agriculture loans and production allotments that enable growers to process raw sugar into Refined Sugar without competition from imports.

152. The start-up capital necessary to compete with the Producer Defendants would be at least hundreds of millions of dollars. Refined Sugar manufacturers must operate large and expensive production facilities and, under the USDA regulatory framework, must be vertically integrated with growers of sugar cane or sugar beets to obtain access to USDA loans and production allotments. USDA production allotments, together with limitations on imports and tariffs, further restrict the ability of new domestic or foreign competitors to enter the market and provide an effective competitive constraint on the Producer Defendants.

**D. Sugar Industry Consolidation and Concentration**

153. The Producer Defendants account for more than 70% of the market for Refined Sugar. The remaining producers do not have market shares that remotely approach those of the Producer Defendants and therefore do not provide an effective competitive constraint on the Producer Defendants' ability to coordinate pricing.

154. Consolidation in the industry has increased. Today there are half as many sugar manufacturers as there were 40 years ago.

155. The market became even more concentrated during the Relevant Time Period as a

result of consolidation among vertically integrated producers. In November 2023, U.S. Sugar Savannah acquired Imperial, substantially increasing the combined dominance of United and ASR/Domino in the Refined Sugar market. The increasing concentration of the market further reduced the number of meaningful competitive alternatives available to purchasers and made coordinated conduct among the dominant producers more feasible and more effective.

**E. Inelastic Supply and Demand**

156. Defendants recognize that Refined Sugar demand is inelastic. The Producer Defendants knew that they could demand higher prices when less Refined Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Refined Sugar.

157. Furthermore, Defendants knew that the price support programs implemented by the USDA limited the number of sources of raw sugar for refinement into Refined Sugar and protected them from foreign competition.

**F. Lack of Significant Substitutes for Refined Sugar**

158. Refined Sugar has no meaningful substitutes. Demand for Refined Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. This demand characteristic encourages collusion because cartel members can, as Producer Defendants did here, raise prices without experiencing a meaningful decline in sales revenue.

**G. Frequent Opportunities to Conspire**

159. There were multiple opportunities for Defendants to develop, monitor, and execute their scheme. One such opportunity was the International Sweetener Colloquium, the aforementioned annual event hosted by The Sweetener Users Association ("SUA") and the International Dairy Farmers Association ("IDFA").

160. The ISC provided ample opportunities for private conversations among Producer Defendants through features such as hotel stays, golf tournaments, presentations, receptions, breakfasts, luncheons, parties, and other social events. These activities created repeated opportunities for Defendants to meet outside formal business settings and communicate privately about matters affecting the Refined Sugar market.

161. As with their use of Commodity, Producer Defendants utilized these opportunities to further their conspiracy. For example, the 2020 ISC is where Domino Sugar's Henderson gathered the Producer Defendants' competitive information later reported to other Domino Sugar employees in March 2020. Similarly, United has acknowledged that Refined Sugar producers use the ISC to communicate pricing, internally debating whether United should have communicated pricing earlier than the ISC. Representatives of all the Producer Defendants have attended at least one ISC during the Relevant Time Period, and Defendants United and Domino Sugar routinely sponsor the event.

162. The American Sugar Alliance also hosts an annual symposium (the "Symposium") attended by Producer Defendants and others in the sugar industry. The Symposium was in its 39th year as of 2024, and attendance "is a must-attend event for all stakeholders." As with the ISC, the Symposium typically features numerous social and other functions amenable to private conversations between Defendants, including a hotel stay, a golf tournament, a reception gala, information sessions and meetings, and breakfast, luncheon, and dinner events.

163. At the ISC, the Symposium, and/or other trade events, the Producer Defendants had ample opportunities, which they utilized, to develop, execute, implement, monitor, and further their conspiracy through the exchange of confidential, competitively sensitive information.

164. The crossover of employees among the Producer Defendants provided additional

opportunities for contact and exchange of competitively sensitive information. ASR/Domino's Director of National Accounts Adam Whittaker, ASR/Domino's National Accounts Manager Brian Dahlman, and United's Director of Strategic Accounts Eric Speece were each former employees of Cargill. Mr. Whittaker worked at Cargill for more than a decade before joining ASR/Domino, while Mr. Speece worked at Cargill for approximately nine years before joining United, and their employment at Cargill overlapped for approximately five years. Mr. Whittaker, Mr. Speece, and Mr. Dahlman were each involved in the exchanges of competitively sensitive information alleged herein. Their overlapping employment histories provide an additional avenue through which executives involved in the alleged information exchange had prior professional relationships and familiarity with one another.

**H. History of Antitrust Violations by Sugar Manufacturers**

165. This is not the first time that problematic coordinated conduct has occurred in this industry. The sugar industry has been marked by repeated violations of the antitrust laws going back nearly 90 years.

166. For example, the United States Supreme Court in the 1930s upheld a lower court ruling that the Sugar Institute, an industry trade association, violated the antitrust laws by, among other things, requiring advance pricing announcements by manufacturers with "a requirement of adherence, without deviation, to the prices and terms publicly announced."[9]

167. In the 1970s, the DOJ accused sugar refiners of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.[10] The defendants in that case entered into a consent

---

9 *United States v. Sugar Institute*, 297 U.S. 553, 582 (1936).

10 *United States v. Great Western Sugar Co., et al.*, Case No. 74-2674-SW at ¶ 15(a) (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar

decree with the Department of Justice in 1978, where they were enjoined from, among other things, "agreeing to fix prices or announce price changes in advance for the sale of refined sugar . . . and from exchanging information, directly or indirectly, as to the sale of refined sugar."[11]

**I. The USDA Sugar Program Does Not Render The Alleged Conspiracy Implausible.**

168. The Defendants' Conspiracy existed independently of the USDA's regulatory framework. The USDA Sugar Program is a federal program, established under the Agriculture and Food Act of 1981, designed to regulate sugar levels in the United States.

169. While the USDA Sugar Program sets certain parameters within the domestic sugar market, it does not set maximum prices for sugar or shield Refined Sugar producers from domestic competition.

170. The USDA Sugar Program has three major pillars: support loans, marketing allotments, and import quotas, none of which preclude the existence—or impact—of price-fixing conspiracies like the one Defendants engaged in here.

171. Price support loans allow sugar processors to borrow against their inventory at predetermined rates and, if necessary, due to low prices, forfeit their sugar as loan repayment. But during the Relevant Time Period, there were no forfeitures, indicating that market prices consistently exceeded the USDA's support levels.

172. Marketing allotments limit the overall amount of sugar that sugar producers can sell domestically for human consumption. However, the Sugar Program does not require producers

Company, American Crystal Sugar Company, Amalgamated Sugar Company, and other sugar refiners).

[11] *U.S. v. Great Western Sugar Co.*, No. 74-2674-SW, 1978 WL 1399 at *2 (N.D. Cal. Sept. 13, 1978); *see* https://www.justice.gov/atr/page/file/1138841/dl?inline for quoted language. This consent decree expired after ten years.

to satisfy their allotments—individually or in the aggregate. Moreover, the allotment framework limited the ability of any non-conspirator producers to undermine the scheme through alternative, non-price fixed sales.

173. Import quotas and tariffs are designed to protect domestic producers by limiting the amount of foreign sugar entering the market. These restrictions were consistent with the conspiracy because they limited external competitive pressures to counteract the Producer Defendants' collusive pricing strategies.

174. The USDA Sugar Program does not actively regulate, or cap, market prices for Refined Sugar. To the contrary, it provided a framework that Defendants exploited to execute their conspiracy.

## XI. ANTITRUST IMPACT AND DAMAGES TO THE PLAINTIFFS

175. Because of the Defendants' anticompetitive conduct: (1) competition in the Refined Sugar market has been reduced or eliminated, (2) prices for Refined Sugar have been maintained at supra-competitive levels, and (3) United States purchasers of Refined Sugar have been deprived of the benefit of price competition.

176. The following chart illustrates the dramatic sugar PPI increase during the Relevant Time Period.[12]




12 https://fred.stlouisfed.org/series/PCU3113131131/#0.

177. As described herein, Plaintiffs directly purchased Refined Sugar from Producer Defendants.

178. As a result, Defendants' unlawful conduct caused Plaintiffs to pay artificially inflated prices for Refined Sugar during the Relevant Period. These prices exceeded the amounts they would have paid if the prices for Refined Sugar had been determined in a competitive market. Plaintiffs have suffered antitrust injury because of Defendants' conduct. The overcharges paid by Plaintiffs for Refined Sugar constitute antitrust injury and harm to competition under the federal antitrust laws.

## XII. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

179. By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statute of limitations.

180. Plaintiffs were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of the Defendants' unlawful conduct could not be discovered until the appellate exhibit volumes from the DOJ matter were made public.

181. In addition, throughout the Relevant Time Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs, and the conspiracy was inherently self-concealing.

182. Plaintiffs relied on Defendants' promises to obey the law and act with integrity.

183. ASR Group's Code of Ethics and Business Conduct states in part, "ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations." It further states that it seeks success "only . . . while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." Regarding antitrust and competition laws, the Code states that ASR Group is "prohibited" from engaging in

"agreements with competitors to fix or control prices," and that it "may not engage in direct or indirect discussions or contacts with competitors regarding . . . [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be sold[;] . . . [and] [b]usiness, marketing or strategic plans."

184. United's Code of Business Conduct and Ethics states that "[o]beying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents, and other representatives must respect and obey the laws of the cities, states, and countries in which we operate." It further states that "[w]e seek to outperform our competition fairly and honestly," and that there is an "obligation to protect [United's] assets [including United's] confidential information. . . . Unauthorized use or distribution of United Sugars' confidential information is prohibited."

185. Michigan Sugar's commitment to "Sustainability and Corporate Social Responsibility" states that the company "live[s] by our values—Excellence, Pride, Integrity, Compassion, and Trust. This is the foundation of a business environment that sets respect and dignity for coworkers, suppliers, customers, and partners as an absolute expectation."

186. These promises to obey the law and behave with integrity prevented Plaintiffs from discovering Defendants' conduct earlier.

## XIII. CAUSES OF ACTION AND CLAIMS FOR RELIEF

### COUNT I

### PRICE FIXING CAUSE OF ACTION FOR VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)

187. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

188. Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act, (15 U.S.C. §§

1, 3) to raise, fix, maintain, or stabilize Refined Sugar prices.

189. Beginning at a time uncertain, but at least by 2019, Defendants agreed with each other to exchange CSI, including competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain, or stabilize the prices of Refined Sugar. The agreement was intended to and did unreasonably restrain trade, suppress competition, and had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States in violation of Section 1and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

190. Pursuant to the agreement, Defendants agreed to and did share pricing, sold position, and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Refined Sugar sold to Plaintiffs.

191. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

192. Plaintiffs were injured by Defendants' agreement that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of Refined Sugar at artificially high levels. Plaintiffs paid higher prices for Refined Sugar than they would have in the absence of Defendants' violations of Section 1 of the Sherman Act.

193. As a direct and proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act, Plaintiffs have suffered injury to their business and property.

194. Plaintiffs are entitled to damages as may be determined by a jury; automatic trebling

of damages, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act (15 U.S.C. § 15).

**COUNT II**

**UNLAWFUL INFORMATION EXCHANGE CAUSE OF ACTION FOR VIOLATION OF SECTION 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)**

195. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

196. Because this claim is based upon the Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Refined Sugar.

197. During the Relevant Time Period, the Producer Defendants and their conspirators controlled at least a collective 70% of the Refined Sugar market and thus possessed market power within it.

198. Beginning at least as early as 2019, the Producer Defendants agreed with each other to exchange CSI, including competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Refined Sugar in the United States.

199. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States to or at supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

200. Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to artificially raise, fix, maintain, or stabilize prices of Refined Sugar sold in the United States to Plaintiffs to or at supra-competitive levels.

201. This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

202. The contract, combination, or conspiracy alleged herein has had the following effects, among others: (a) Price competition in the sale of Refined Sugar has been restrained, suppressed, and/or eliminated in the United States; (b) Prices for Refined Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States; and (c) Plaintiffs have been deprived of the benefits of free and open competition.

203. For all these reasons, Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

204. As a direct and proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act, Plaintiffs have suffered injury to their business and property. Plaintiffs are entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Section 4 of the Clayton Act (15 U.S.C. § 15).

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, as follows:

1. That the Court adjudge and decree that Defendants' anticompetitive scheme unreasonably restrained trade and is unlawful and that each has violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

2. That the Court award Plaintiffs three times their damages sustained from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15(a));

3. That the Court award Plaintiffs their costs of this case and reasonable attorneys' fees under Section 4 of the Clayton Act (15 U.S.C. § 15(a));

4. That the Court award Plaintiffs pre- and post-judgment interest to the extent allowed by law, including 15 U.S.C. § 15(a) and 28 U.S.C. § 1961; and

5. That the Court award Plaintiffs such other and further relief as the case may require and the Court may deem just and proper.

## XV. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on any and all claims from which a right to a jury arises.

Dated: August 24, 2026

Respectfully submitted,

*<u>/s/ Linda P. Nussbaum</u>*
Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1225 Franklin Avenue
Garden City, NY 11530
Telephone.: (917) 438-9189
Email: lnussbaum@nussbaumpc.com

Roberta D. Liebenberg
Gerard A. Dever
Jeffrey B. Gittleman
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Email: rliebenberg@finekaplan.com
Email: gdever@finekaplan.com
Email: jgittleman@finekaplan.com

*Counsel for Plaintiffs*